UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

------------------------------------------------------X
                                           :

CLIMACELL, INC.,                     :

                             :

             Plaintiff,         :

                             :                     Civil Action No.

          v.                  :                   _____

                             :

HAGIT MESSER-YARON,          :

                             :

             Defendant.      :

                             :
------------------------------------------------------X

## **COMPLAINT**

1.      In this action plaintiff ClimaCell, Inc. ("ClimaCell"), a Delaware corporation headquartered in Boston, seeks a declaratory judgment, monetary damages and other relief against defendant Professor Hagit Messer-Yaron ("Defendant"), an Israeli citizen who resides in Israel, concerning, *inter alia*, her misinterpretation and breach of certain contractual obligations to ClimaCell under the terms of an agreement between her and ClimaCell, dated as of September 15, 2016 (the "September 15, 2016 Agreement"), a true and correct copy of which is attached hereto as Exhibit A, as well as breaches of other obligations to ClimaCell set forth in a series of related agreements between her and ClimaCell.  In addition, ClimaCell seeks relief in the form of an injunction, declaratory relief and damages against Defendant for the misappropriation of trade secrets from ClimaCell in violation of the requirements of the Defend Trade Secrets Act of 2016 ("DTSA"), as set forth in 18 U.S.C. § 1836(b) *et seq*., and for other conduct by Defendant as described below.

## **Parties**

2.      ClimaCell is a Delaware corporation, with its headquarters at 280 Summer Street,

Boston, MA 02210.  The company was founded on November 12, 2015.  ClimaCell has developed novel sensing technologies that leverage already-existing datasets from a wide variety of infrastructure, including wireless networks that operate across state and country boundaries, and turn the data into environmental observations, which are then used to feed high-resolution forecasting models across multiple time scales.  For example, the company uses commercial microwave link attenuation information as inputs to create weather data, and then combines that weather data to produce highly accurate, near-real-time forecasts of weather, including rain and rainfall accumulations.  The company's customers and business partners include (but are not limited to) commercial microwave network operators, automobile manufacturers and hydrologists.  ClimaCell's products and services are used in, and are intended for use in, interstate and foreign commerce.  ClimaCell's products and its proprietary software and methodology are currently being used in the United States, Israel, Japan, India, Australia and countries in Latin America and Europe, with approximately $10 million in sales in 2019.

3.     Defendant is a professor at Tel Aviv University ("TAU") in Tel Aviv, Israel, and is a citizen of Israel who resides at Dr. Moshe Sne St 24 Kfar Saba, Israel.  On information and belief, she is not lawfully admitted for permanent residence in the United States and is not domiciled in Massachusetts.  She is a shareholder in ClimaCell, one of the founders of the company, and a former chief scientist for ClimaCell.  Although she is no longer employed by the Company, she is a party to certain agreements with ClimaCell that are at issue in this lawsuit.

## Jurisdiction and Venue

4.     This Court has subject matter jurisdiction over this matter under 28 U.S.C. §§ 1332(a)(2) and 1332(c)(1) because the lawsuit is between ClimaCell, a Delaware corporation with its principal place of business in this District, and Defendant, a foreign citizen who resides

in Israel and who is not lawfully admitted for permanent residence in the United States and is not domiciled in Massachusetts or Delaware, and because the amount in controversy exceeds $75,000, exclusive of interests or costs, as described below.  In addition, this Court has federal question subject matter jurisdiction over this matter arising out of the DTSA, pursuant to 18 U.S.C. § 1836(c), because the trade secrets at issue are related to a product or service provided by ClimaCell that is used in, and intended for use in, interstate and foreign commerce.

5.      This Court has personal jurisdiction over Defendant and is a proper venue because (i) under 28 U.S.C. § 1391(c)(3), Defendant is not a United States citizen and she does not reside in the United States, and thus can be sued in any U.S. district court, and (ii) Defendant agreed in Section 5.2 of her separation agreement dated September 15, 2016, that the "competent courts in the Commonwealth of Massachusetts shall have the sole and exclusive jurisdiction in any matter pertaining to this Agreement," and thereby agreed to venue in this Court and waived any objection to this Court's venue.

## **Background Facts**

I.      **Defendant's Role in ClimaCell and the Negotiation and Terms of the September 15, 2016 Agreement, and Other Related Agreements Pertaining to Defendant's Obligations to ClimaCell**

6.      ClimaCell was formed as a Delaware company on or about November 12, 2015. There were four "founders," specifically:  Shimon Elkabetz, Rei Goffer, Itai Zlotnik, and Defendant.  Over time, there were disputes between Defendant and the other founders.

7.      In 2016, Defendant negotiated a separation agreement with the other three founders.  That agreement, referred to herein as "the September 15, 2016 Agreement," was signed by the partners as of that date.  In that agreement, Defendant was referred to as the "Co-Founder," and the others as the "Remaining Founders."

8.      In the second "Whereas" clause, the September 15, 2016 Agreement states explicitly that "the parties wish amicably to settle in this Agreement fully and finally all claims and/or demands and/or disputes and/or matters deriving from any relationship between Co-Founder on the one hand and the Company on the other hand."

9.      Section 1 of the September 15, 2016 Agreement sets forth terms and conditions on which Defendant would provide consulting services to ClimaCell, and states that such consultation shall last to December 31, 2016, after which the parties could decide to extend the relationship.

10.      Section 2.1 of the September 15, 2016 Agreement relates to the Company's agreement to repurchase from Defendant a certain number of shares of the Company.  Upon that repurchase, which did occur, an earlier agreement regarding restricted stock in the company was terminated.

11.      Section 2.2 of the of September 15, 2016 Agreement states as follows:

"Following the Company's repurchase of the Shares as set forth in Section 2.1 above, the Co-Founder [i.e., the Defendant] will hold a total of [certain number of] Shares in her name in the Company's records.  Notwithstanding any other provision or arrangement to the contrary, the parties hereby agree and covenant that [Defendant's] holdings in the Company's issued and outstanding capital on a fully diluted basis will all      times [sic] maintain a ratio of not less than 25% to the holdings of the remaining founder with the highest holding in the Company on a fully diluted basis.  If required, the Company will issue to [Defendant] additional shares/options at par value in order to maintain the aforementioned holding ratio."

12.      Attached to the September 15, 2016 Agreement was a document referred to in Section 3.1 of that Agreement as the "NDA."  The NDA is entitled "Founder Invention, Non-Disclosure, Non-Competition and Non-Solicitation Agreement" and states that it is "made this ___ day of January, 2016" between ClimaCell and Defendant.  The NDA is incorporated by reference in the September 15, 2016 Agreement in Section 3.1.  A true and accurate copy of the

4

NDA is attached in Exhibit A hereto.  Defendant signed the document on page 7 of the NDA.

13.     Section 3.1 of the September 15, 2016 Agreement also states that the NDA shall

be subject to the terms and conditions of an agreement dated February 15, 2016, by and between

ClimaCell and Ramot at Tel Aviv University Ltd. (the "Ramot Agreement").  A true and correct

copy of the Ramot Agreement is attached hereto as Exhibit B.  Ramot at Tel Aviv University

Ltd. ("Ramot") is an entity whose business includes commercializing or licensing inventions,

including obtaining rights to alleged inventions by scientists at TAU.  Defendant was familiar

with the terms of the Agreement between ClimaCell and Ramot.

14.     In the Ramot Agreement, Ramot and ClimaCell agreed that, in exchange for

ClimaCell providing [a certain number of] shares of ClimaCell stock to Ramot, ClimaCell would

in exchange (i) be regarded as the owner of any inventions resulting from work done by

Defendant as part of her ongoing consultation duties to ClimaCell (for which the term "Research

Results" was used in the Ramot Agreement) and receive the assignment of all rights to work

done by Defendant falling within the category of Research Results, and (ii), for work done by

Defendant for TAU or Ramot that falls within the definition of a "Future Invention" in the

Ramot Agreement, receive a "Right of First Review" that would give ClimaCell the "first right

to negotiate an exclusive License to the Future Invention" on the terms set forth in the Ramot

Agreement.  Ex. B § 3.1.

15.     Going back to the September 15, 2016 Agreement, in Section 3.2 of that

agreement, Defendant explicitly confirmed that she "shall be bound by the terms of Non-

Competition and Non-Solicitation as set forth in the NDA for a period ending one (1) year from

the date on which [she] ceased providing services to the Company."

16.     Defendant provided services to the Company through December 31, 2016.  Under

Section 3.2 of the September 15, 2016 Agreement, however, she continued to be bound by "the terms of Non-Competition and Non-Solicitation as set forth in the NDA" for an additional year, until December 31, 2017.

17.     In Section 5.2 of the September 15, 2016 Agreement, Defendant also agreed as noted above that disputes over that Agreement—including the agreements incorporated by reference—shall be "governed by the laws of the Commonwealth of Massachusetts," and that the "competent courts in the Commonwealth of Massachusetts" shall have "the sole and exclusive jurisdiction in any matter pertaining to this Agreement."

**II.     Defendant Informs ClimaCell She Has Agreed to Sell the Majority of Her ClimaCell Stock Shares to a Third Party, and She Demands to Be Allocated Additional Shares of ClimaCell to Replace the Shares That She Seeks to Sell to the Third Party**

18.     In a document entitled "Letter of Intent to Acquire Your Shares In ClimaCell, Inc.," an investor sent a letter to Defendant dated April 1, 2019 (the "Letter of Intent").

19.     The Letter of Intent set out agreed-upon terms by which the investor would purchase "an aggregate of [a certain number of] shares of Common Stock" of ClimaCell from Defendant, in exchange for a cash payment of a certain amount, plus a potential future contingent payment.  Other terms and conditions of the sale are set forth in the Letter of Intent, including conditions set forth in paragraph 4 of the Letter of Intent.  The Letter of Intent bears the signature of a representative of the investor, and the signature of Defendant, just after the letter's requirement on the final page that it be accepted by April 2, 2019.

20.     On May 27, 2019, Defendant's attorney, Mr. Eran Yaniv, sent a letter to the CEO of ClimaCell, Shimon Elkabetz.

21.     Mr. Yaniv, in his letter as Defendant's representative, mischaracterizes the terms of the September 15, 2016 Agreement, and in particular misstates the terms of Section 2.2 of the

September 15, 2016 Agreement, which is quoted in paragraph 11 above.

22.     Rather than quote the actual language in the September 15, 2016 Agreement, Defendant's counsel Mr. Yaniv states that: "Section 2.2 of the Agreement states that Prof. Messer-Yaron's stake in the Company's share capital, on a fully diluted basis, shall be at least 25% of the total holdings in the Company, held by such Other Co-Founder whose holdings in the Company, on a fully diluted basis, is the highest among the Other Co-Founders (hereinafter: 'Holdings Ratio')."  He states in the next paragraph, again without quoting the actual language of the Agreement, that:  "At the end of section 2.2 of the Agreement, it also is stated that, to the extent necessary, the company will issue Prof. Messer-Yaron additional shares or options (as necessary) of the Company, at their par value, in order to preserve the Holdings Ratio."

23.     The actual language of the Agreement, however, is fundamentally different, and gives no such right to replace shares that Defendant has voluntarily sold for profit.  Section 2.2 of the September 15, 2016 Agreement states that "following the Company's repurchase of the Shares as set forth in Section 2.1 above, the Co-Founder [Prof. Messer-Yaron] **will hold** a total of [a certain number of] Shares in her name in the Company's records."  Ex. A at September 15, 2016 Agreement § 2.2 (emphasis added).  This language envisions that Defendant will maintain her ownership of [that number of] shares.

24.     The Agreement then states further:

> "*[T]he parties hereby agree and covenant* that [Defendant's] holdings in the Company's issued and outstanding capital on a fully diluted basis *will all times [sic] maintain* a ratio of not less than 25% *to the holdings of the remaining founder with the highest holding in the Company on a fully diluted basis*.  If required, the Company will issue to [Defendant] additional shares/options at par value in order to maintain the aforementioned holding ratio."

*Id.* (emphasis added).

25.     This contract language is entirely *in*consistent with Defendant's characterization

of the Agreement, which would allow Defendant (i) to intentionally sell off a significant number of her shares to a third party for her own profit, thereby reducing her percentage unilaterally below the 25% ratio, and then (ii) thereafter demand to be given new shares to replenish her shares back up to the 25% ratio, thereby enabling her to possibly sell the replenished shares *again* for profit, and then be replenished again, and again.  Such an interpretation of the September 15, 2016 Agreement, however, is inconsistent with its language and intent, which is to ensure that—if the highest of the remaining founders ***increases*** his holding such that Defendant's share drops below 25% of that founder's holding, then her shares can be increased to achieve the stated ratio.  The Agreement does not provide Defendant with the right to be given a never-ending supply of shares to sell for profit, and then recoup, while the remaining founders' and all other shareholders' holdings are diluted over and over.  No potential buyer of Defendant's shares would agree to purchase her shares if immediately afterward the value of the purchased shares would be diluted by the issuance of new shares to Defendant.  What Defendant demands through her attorney's letter is contrary to the language, intent and purpose of the September 15, 2016 Agreement.

### III.   Defendant Violated Her Obligations to ClimaCell by Filing Patent Applications That Are Based at Least in Part on ClimaCell Trade Secrets and Other Confidential Information

26.    A further violation of Defendant's obligations to ClimaCell recently came to ClimaCell's attention after U.S. Patent Application No. 2019/0049626, which was filed with the U.S. Patent Office on August 12, 2018 (the "Final Application"), was made public for the first time on February 14, 2019 when it was published by the Patent Office.  Defendant and Dr. Ostrometzky are the named inventors on that application, a true and accurate copy of which is attached hereto as Exhibit C.  The Final Application is entitled "Relating Rain Intensity and

Dynamic Range in Commercial Microwave Links," and further lists Ramot as the applicant and assignee of the patent.

27.     This patent application claims priority from an earlier provisional application—No. 62/544,953—filed on August 14, 2017, by Defendant and Dr. Ostrometzky (the "Provisional Application"), who were listed as the inventors.  The Provisional Application, which was signed by Defendant, did not identify Ramot as an assignee or applicant.  No assignment of the Provisional Application was on file with the Patent Office.  Under Patent Office rules, the Provisional Application was not made public until February 14, 2019, when the final application ("Final Application") was published.  A true and accurate copy of the Provisional Application is attached hereto as Exhibit D.

28.     During and after the time Defendant and Dr. Ostrometzky were working on the Provisional Application and then filing it with the Patent Office, Defendant continued to be bound by the terms of the NDA, as she had agreed in Sections 1.21 and 3.2 of the NDA.  Dr. Ostrometzky was also subject to confidentiality restrictions in his own consulting agreement with ClimaCell.

29.     In Section 2(a) of Defendant's NDA, Defendant agreed that "Proprietary Information" of ClimaCell included "all information and know-how, whether or not in writing, of a private, secret or confidential nature concerning the Company's business or financial affairs," including "discoveries, ideas, inventions, products, [] methods, techniques" and business and marketing plans.  Ex. A at NDA § 2(a).  Defendant further agreed that such Proprietary Information is the "exclusive property of the Company [ClimaCell]" and is to be kept confidential.  *Id.*

30.     Similarly, in Section 3(b) of Defendant's NDA, entitled "Developments,"

Defendant agreed that she would "make full and prompt disclosure to the Company of all discoveries, ideas, inventions . . . which are created, made, conceived or reduced to practice by the Founder or under the Founder's direction or jointly with others during the Founder's Service . . . and which *relate directly or indirectly to the business of the Company*, including the business of collecting and analyzing weather data." (emphasis added).  And in that same paragraph, Defendant agreed to "assign and does hereby assign to the Company . . . all the Founder's right, title and interest in and to all Developments . . . and all related patents [and] patent applications[.]"  *Id.* (emphasis added).  By the terms of Section 3(b), this assignment provision applied to Developments that "relate to the business or research and development conducted or planned to be conducted by the Company at the time such Development is created, made, conceived or reduced to practice."

31.    As noted above, Defendant further agreed that her obligations under the NDA extended specifically for a "period ending one (1) year from [December 31, 2016] the date on which the Co-Founder ceased providing services to the Company."  *Id.* at September 15, 2016 Agreement § 3.2.  ***In other words, the term of Defendant's confidentiality obligations to ClimaCell under the NDA, and her obligation to assign all of her rights, title and interest in Developments and all related patents and patent applications to ClimaCell, extended through at least December 31, 2017.***

32.    This time period of "Founders' Service," as used above, encompasses the time during which Defendant filed the Provisional Application with the U.S. Patent Office, as discussed above, on August 14, 2017, while she was bound by the NDA.  As a result, Defendant had already—pursuant to Section 3(b) of the NDA and the provisions described above— specifically assigned to ClimaCell all her right, title and interest into the "discoveries, ideas,

inventions" that were "created, made, conceived to practice by the Founder or under the

Founder's direction or jointly with others during the Founder's service," including her rights to

the disclosed invention or inventions filed and disclosed in the Provisional and Final

applications.  Those applications clearly related to the business or research conducted or planned

to be conducted *by ClimaCell* at the time, including in connection with potential ClimaCell

developments in real-time weather monitoring and reporting, and with the business opportunities

for extending network management services for operators of CML-based ("Commercial

Microwave Link") networks to include real-time monitoring and reporting.

33.     In addition, the Provisional Application itself, filed by Defendant and Dr.

Ostrometzky without ClimaCell's permission or knowledge, falls within the scope of

"proprietary and confidential" information of ClimaCell as defined in the NDA.  Specifically, the

contents of the Provisional Application meet the two critical requirements set forth in the NDA:

(i) Time:  The Provisional Application was filed with the U.S. Patent Office on August 14,

2017, while Defendant was subject to the NDA and the terms and duties to ClimaCell set forth

therein; and (ii) Subject matter:  The alleged inventions disclosed in the Provisional Application

(and the Final Application) specifically "relate to the business or research and development

conducted or planned to be conducted by the Company at the time such Development is created,

made, conceived or reduced to practiced."

34.     With this conduct, Defendant breached the NDA by secretly drafting and filing

both the Provisional Application and the Final Application, without giving notice to ClimaCell of

the existence or filing of either application, or of her attempt to claim ownership of an invention

that could be used by third parties to compete against ClimaCell.  Her failure to disclose this

alleged invention—indeed, her deliberate concealment of the provision and final applications

from ClimaCell—was intentional and in violation of her clearly stated obligations to ClimaCell.

35.     Furthermore, on information and belief, in drafting the Provisional Application and the subsequent Final Application, Defendant violated the terms of the NDA by using and disclosing in the Provisional and Final Applications confidential information of ClimaCell that had been the subject both of research and development activities done at ClimaCell and of confidential business discussions within ClimaCell both before and after Defendant filed the Provisional Application with the U.S. Patent Office in August 2017.

36.     Specifically, the ClimaCell confidential information that Defendant used in drafting or contributing to the drafting of the Provisional and subsequent Final Applications included information from internal discussions and documents at ClimaCell pertaining to, for example, ClimaCell's confidential plans for developing new products.

37.     On information and belief, ClimaCell has been injured by this improper use of ClimaCell's confidential new product developments because, as a result of Defendant's violations of her agreements and her failure to disclose the patent applications and her assignment of the Final Application to Ramot, Ramot has marketed the alleged invention in the Final Application to competitors or potential competitors of ClimaCell and by so doing has thereby harmed ClimaCell.  ClimaCell was and is a leader in this field and was well ahead of actual or potential competitors in developing the next generation of products.  But the publication of the Final Application as a result of Defendant including references to ClimaCell's has breached Defendant's obligations to ClimaCell by disclosing to the public information concerning, for example, the use of real-time capabilities that would increase the ability of competitors to affect ClimaCell's business, and also make it possible for competitors to sell in countries outside the United States, which on information and belief is the only country in which

Defendant, and consequently Ramot, has sought to patent the alleged invention disclosed in the Final Application.  In doing so, Defendant not only misappropriated ClimaCell's inventions and proprietary know-how, but also deprived ClimaCell of the basic right to decide how its inventions and proprietary know-how owned by ClimaCell will be treated, protected and commercialized (if at all) and caused material loss of rights in all countries in which patent protection was not sought by Defendant or subsequently by Ramot.  It is also ClimaCell's belief that some of its proprietary know-how which was misappropriated by Defendant was included in the description in the patent application filed by Ramot but was not covered by the claim of the said application—leading to complete loss of right and leakage of the relevant intellectual property in its entirety into the public domain.

38.     On information and belief, Defendant's breaches of her contractual obligations in connection with the alleged new invention as recited in either or both of the Provisional Application and the Final Application have thus caused, and likely to continue to cause, further harm to ClimaCell in the form of lost sales or profit in excess of $1,000,000.

## CAUSES OF ACTION

### COUNT I
### Declaratory Judgment Regarding the Meaning of
### Section 2.2 of the September 15, 2016 Agreement

39.     ClimaCell incorporates herein the allegations in paragraphs 1 through 38 above.

40.     There is a genuine and ongoing dispute between the parties as to the scope and meaning of the language of Section 2.2 of the September 15, 2016 Agreement, which states as follows:

> "Following the Company's repurchase of the Shares as set forth in Section 2.1 above, the Co-Founder [i.e., the Defendant] will hold a total of [certain number of] Shares in her name in the Company's records.  Notwithstanding any other provision or arrangement to the contrary, the parties hereby agree and covenant

that [Defendant's] holdings in the Company's issued and outstanding capital on a
fully diluted basis will all times [sic] maintain a ratio of not less than 25% to the
holdings of the remaining founder with the highest holding in the Company on a
fully diluted basis.  If required, the Company will issue to [Defendant] additional
shares/options at par value in order to maintain the aforementioned holding ratio."

41.     Wherefore, for the reasons stated above, ClimaCell asks the Court to enter a

declaratory judgment or such other and further relief as appropriate finding that Defendant is not

entitled to obtain replenishment or replacement of any of the shares she sells to the investor or

any other third party, notwithstanding the language of Section 2.2, and further that the language

of Section 2.2 does not require ClimaCell to issue new shares to Defendant, or to replenish or

replace any shares of ClimaCell stock that Defendant sells, gives or otherwise transfers to third

parties.

## COUNT II
### Declaratory Judgment Confirming ClimaCell's Ownership Rights
### in the Pending Patent Application and Any Inventions Disclosed Therein

42.     ClimaCell incorporates herein the allegations in paragraphs 1 through 41 above.

43.     There is a genuine and ongoing dispute between the parties as to the ownership of

the inventions alleged or claimed in the Provisional and Final Applications.

44.     For the reasons stated above, Defendant has breached Section 3(b) of the NDA,

which requires that during the term of the NDA she would "make full and prompt disclosure to

the Company [ClimaCell] of all . . . inventions . . ., whether patentable or not, . . . (ii) which are

created, made, conceived, or reduced to practice by the Founder or under Founder's direction or

jointly with others which were created, made, conceived or reduced to practice by the Founder or

under the Founder's direction or jointly with others during the Founder's service."

45.     45.     Furthermore, in that same paragraph of the NDA, Defendant agreed to

"assign and does hereby assign to the Company … all the Founder's right, title and interest in

and to all Developments … and all related patents, [and] patent applications ….'' These assignment provisions apply to the Provisional Application and the Final Application and confirm that ownership of the alleged inventions was assigned to ClimaCell.

46.     As alleged above, Defendant also breached the NDA by knowingly withholding from ClimaCell that she and Dr. Ostrometzky had filed the Provisional and Final Applications for their alleged invention, and by not assigning her rights in the inventions claimed in the patent applications to ClimaCell as further required by the NDA.

47.     Wherefore, ClimaCell asks that this Court order and decree that Defendant has breached the terms of the NDA, and order appropriate relief, including without limitation issuing an order from Court confirming ClimaCell's ownership rights in the pending patent application, and further ordering that Defendant's assignment of her rights in the patent applications to Ramot to be null and void, as well as ordering such damages as are just and appropriate.

**COUNT III**
**Defendant's Breach of Contract and**
**the Covenant of Good Faith and Fair Dealing**

48.     ClimaCell incorporates herein the allegations in paragraphs 1 through 47 above.

49.     Defendant has breached the language and terms, and the covenant of good faith and fair dealing, arising from the September 15, 2016 Agreement, the NDA, and other agreements incorporating the NDA.

50.     Without limitation, in violation of the September 15, 2016 Agreement and the NDA, Defendant knowingly concealed or otherwise knowingly failed to notify or inform ClimaCell that she had been working with Dr. Ostrametzky on the alleged invention described in the Provisional Application and thereafter in the Final Application referenced above. Among other things, Defendant concealed from ClimaCell the existence of the Provisional and Final

Applications, and in the course of doing so also concealed from ClimaCell that she had used confidential information of ClimaCell in the development of the two patent applications, and had communicated that information to Ramot without the permission of ClimaCell, in violation of at least paragraph 3(b) of the NDA.

51.     By breaching her NDA with ClimaCell and concealing from ClimaCell the existence of the Provisional and Final Applications and the assignment of the Final Application to Ramot, Defendant failed to live up to her obligations under her agreements with ClimaCell to assign her interest in the applications to ClimaCell, and thereby caused damages to ClimaCell in the form of, without limitation:

(i)     Precluding ClimaCell from becoming an owner of the alleged invention even before any patent application was filed;

(ii)     Precluding ClimaCell from pursuing a strategy that would have kept the alleged invention as ClimaCell trade secrets, instead of choosing to file the patent applications and thereby reveal and make available the technology to ClimaCell's potential competitors;

(iii)     Denying ClimaCell any role in the strategy for maximizing the value of the patent applications, and then reducing the value of the alleged inventions by filing only in the United States, thus precluding ClimaCell from the ability to have more broadly patented the alleged invention in countries other than the United States, and thereby giving ClimaCell's competitors the ability to compete without risk of patent infringement in those other countries; and

(iv)     By improperly disclosing other ClimaCell trade secrets in the Provisional and Final Applications, including the business opportunities identified by ClimaCell of providing improved network management services to operators of CML networks, in particular, the cellular network services operators that use CML networks for backhaul; as well as use of the alleged

invention for "real-time" measurements as disclosed by Defendant in the patent applications without ClimaCell's permission or knowledge.

52.     On information and belief, Defendant's breaches of the NDA and other agreements incorporating the NDA were knowing and intentional.

53.     Wherefore, ClimaCell asks the Court to award damages and such other and further declaratory or injunctive relief against Defendant as this Court determines is just and appropriate.

## COUNT IV
## Intentional Interference with Business Relations

54.     ClimaCell incorporates herein the allegations in paragraphs 1 through 53 above.

55.     On information and belief, at the time of the filing of the Provisional Application and the Final Application, Defendant was aware of the Ramot Agreement, and she was also aware of the terms of the Ramot Agreement that provided for ClimaCell to have a Right of First Review that could enable ClimaCell to license alleged inventions as provided in the Ramot Agreement.

56.     By concealing from ClimaCell that she had worked with Dr. Ostrometzky to file a preliminary patent application, that she and Dr. Ostrometzky had on information and belief assigned their rights to Ramot, and that Ramot had filed a patent application describing potential inventions that not only were based in part on confidential discussions internal to ClimaCell but which also could be used in direct competition with ClimaCell, Defendant intentionally interfered with ClimaCell's contractual relations with Ramot under the Ramot Agreement, and also interfered with ClimaCell's potential contractual relationship with third parties who were potential customers for ClimaCell.

57.     Defendant also deprived ClimaCell of the opportunity to obtain the rights to the patent application under the terms of the Ramot Agreement, of the ability to determine whether and how to exercise those patent rights, and the ability to control the marketing of the alleged invention.  Defendant's and Ramot's efforts to market the alleged invention in the pending application have caused harm to ClimaCell's potential business relations with its existing and potential customers.

58.     Wherefore, ClimaCell asks the Court to award damages and such other and further declaratory or injunctive relief as this Court determines just and appropriate.

### COUNT V
### Violation of the Defend Trade Secrets Act of 2016 ("DTSA")
### 18 U.S.C. § 1836(b) *et seq.*

59.     ClimaCell incorporates herein the allegations in paragraphs 1 through 58 above.

60.     Defendant should also be held liable under the DTSA for misappropriation of ClimaCell's trade secrets.  As noted above, in 2016, Defendant entered into the September 15, 2016 Agreement with ClimaCell (Exhibit A).  Section 3 of the September 15, 2016 Agreement is entitled "Confidentiality, Non-Competition and Intellectual Property."  In Section 3.1, Defendant agreed to "continue to comply with all of the terms, conditions and obligations as set forth in the NDA attached hereto. . . .  The NDA, and all the terms, conditions and obligations set forth therein, are hereby incorporated by reference in the entirety as if the provisions of the NDA were set forth in this Agreement."  The NDA is also included in Exhibit A to this Complaint.

61.     In the NDA, Defendant (referred to in the NDA as the "Founder") acknowledged that "the nature of [ClimaCell's] business is such that protection of its proprietary and confidential information is critical to the survival and success of the Company's business."  Ex. A at NDA § 1.  In Section 2(a), the NDA defines "Proprietary Information" very broadly.

Defendant agreed that she would not "disclose any Proprietary Information to any person or entity other than employees of the Company or use the same for any purposes (other than in the performance of the Founder's duties in providing Service) without written approval by an office of the Company, either during or after Founder's Service, unless and until such Proprietary Information has become public knowledge without fault by the Founder."  Defendant committed to use her "best efforts to prevent unauthorized publication or disclosure of any of the Company's proprietary information." *Id.*

62.     In Section 3 of the NDA, Defendant was invited to list any inventions or ideas conceived of or reduced to practice by her prior to the Founder's service and which are owned by the Founder.  She identified no such inventions or ideas.  Defendant also committed to making "full and prompt disclosure to the Company of all discoveries, ideas, inventions[]" dating from before the date of the NDA, *or which were made during the term of the agreement but during the Founder's service*. *Id.* § 3(b).  For this as well, no such discoveries, ideas, or inventions were disclosed by Defendant.  As noted above, Defendant violated her obligation under the NDA when she did not disclose to ClimaCell that she and Dr. Ostrometzky had filed the Provisional Application, or that they on information and belief subsequently assigned their rights in the Final Application to Ramot.

63.     Defendant further agreed in the NDA that her disclosure obligations to ClimaCell "extended specifically for a "period ending one (1) year from the date on which the Co-Founder ceased providing services to the Company," *id.* at September 15, 2016 Agreement § 3.2, which was December 31, 2016, or through at least one year <u>after</u> December 31, 2016.  In other words, the term of the NDA lasted through at least December 31, 2017. *Id.* §§ 1.2, 3.2.

64.     Notwithstanding her obligations under the September 15, 2016 Agreement and the NDA, while she was still in her time of Service under the NDA and thus subject to the NDA, on information and belief, Defendant worked to prepare and file the Provisional Application with the U.S. Patent Office on August 14, 2017, and thereafter assign her rights to Ramot, as did Dr. Ostrometzky.  In so doing, Defendant concealed the existence of the Provisional Application, and later the Final Application, from ClimaCell, thereby misappropriating inventions that belonged to ClimaCell under ClimaCell's agreement with Defendant.  And by doing so, on information and belief, Defendant received value of an unknown nature from Ramot, in order that she might profit off their effort to claim ownership of applications that should have been disclosed to ClimaCell and owned by ClimaCell.

65.     In addition, at various times in the last three years, on information and belief, Defendant has also disclosed to the public, without permission from ClimaCell and in breach of her confidentiality obligation, certain proprietary processes and techniques that were conceived and invented at ClimaCell, and that Defendant had known—from her position as acting chief scientist at ClimaCell—were included in ClimaCell's near-term development plans and were considered strategic in value to ClimaCell.  Such processes and techniques were shared with Defendant in the course of her work with ClimaCell and under the confidentiality protections provided by her agreements, including the NDA.  ClimaCell considered these processes and techniques as ClimaCell's proprietary and confidential trade secrets and intended that they be kept confidential under the terms of the NDA.

66.     On information and belief, trade secrets of ClimaCell that were disclosed by Defendant in violation of her confidentiality obligations to ClimaCell include, without limitation:

a.      Methods and critical feature aspects of improvements, including the recognition

that real-time forecasting is a requirement for improving CML management, and for teaching methods for adapting previous non-real time CML bias determination and monitoring techniques to be usable in real time;

b.       Methods of processing the information embedded in the Tx/Rx signal levels of Commercial Microwave Networks microwave links to provide weather products such as real-time, high tempo-spatial precipitation maps;

c.       Methods and techniques for predicting very rapidly in real time when heavy rains will result in potentially dangerous flash flooding in local streams, using high quality data in real time to determine how much water is reaching the ground; and

d.       Techniques for deriving near real time precipitation maps from microwave signal data.

67.       ClimaCell undertook reasonable measures to keep its confidential information regarding these processes and inventions as trade secrets, including requiring Defendant and Dr. Ostrometzky to enter into specific agreements, such as the NDA and Dr. Ostrometzky's consulting agreement, with specific provisions regarding the confidentiality of ClimaCell's confidential information.  In addition, ClimaCell took steps to keep its confidential information safe and secure in the Company's information systems, and in its physical offices.

68.       In a field such as this one, where ClimaCell is a leader in the industry, ClimaCell protects confidential algorithms and processes that are sufficiently high in economic value, and not generally known or easily reverse engineered in the industry, so as to provide additional economic value to the company, and to its customers.

69.       In this case, Defendant misappropriated ClimaCell's trade secrets by using her inside information about ClimaCell's confidential techniques, processes and research and

development plans in patent applications or in publications.  As a result of Defendant's conduct, ClimaCell has been significantly harmed by Defendant's unlawful use and disclosure of ClimaCell's confidential trade secret processes and information, and Defendant should be required to pay damages in an amount sufficient to compensate ClimaCell for its losses resulting from Defendant's unlawful disclosure of trade secret information.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment for Plaintiff and provide relief that includes the following:

A.      Find that Defendant breached her obligations under the September 15, 2016 Agreement, the NDA, and other agreements incorporating the NDA, by, *inter alia*, violating Sections 2(a) and 3(b) of the NDA, by concealing from ClimaCell that she was working on the alleged inventions set forth in the Provisional and Final Applications that were filed by Defendant with the U.S. Patent Office and were actively marketed by Ramot (as assignee of the alleged inventions from Defendant and Dr. Ostrometzky) to third parties in competition against ClimaCell, and award damages and injunctive relief to ClimaCell;

B.      Find that Defendant intentionally interfered with ClimaCell's contractual relationship with Ramot by concealing from ClimaCell Defendant's filing of the Provisional and Final Applications and thereby preventing ClimaCell from exercising its Right of First Review under the Ramot Agreement, and awarding damages and injunctive relief appropriate to remedy the harm to ClimaCell;

C.      Declare that ClimaCell is the proper owner of the Provisional Application and the Final Application and any other patent applications as may be filed based on those applications, as if ClimaCell had been properly assigned Defendant's rights to the Provisional Application and

the Final Application, and without ClimaCell being bound by Defendant's unlawful assignment of her rights in the patent applications to Ramot;

D.      Enter judgment finding that ClimaCell's interpretation of the language of Section 2.2 of the September 15, 2016 Agreement is correct in that Defendant's sale of her shares in ClimaCell to a person or entity that is not one of the Founders under Section 2.2 does not require ClimaCell to issue additional shares to Defendant in order to maintain Defendant's ratio of shares at no less than 25% to the remaining founder with the highest holding in the Company on a fully diluted basis;

E.      Find that Defendant willfully and maliciously misappropriated ClimaCell's trade secrets;

F.      Award damages for ClimaCell and against Defendant in an amount to be determined, including without limitation exemplary damages of two times the amount of actual damages awarded, and award costs and fees to ClimaCell, including without limitation ClimaCell's reasonable attorneys' fees and costs; and

G.      Grant such other and further relief as is just and appropriate.

Dated:   July 8, 2019

Respectfully submitted,

CLIMACELL, INC.

By its attorneys,

/s/ J. Anthony Downs

J. Anthony Downs (BBO No. 552839)
Anthony S. Fiotto (BBO No. 558089)
GOODWIN PROCTER LLP
100 Northern Avenue
Boston, MA 02210
Tel.: +1 212 813 8100
Fax.: +1 212 355 3333